UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re ) | |
| ) | |
| BRIGHT BEGINNINGS ORMOND, LLC, ) | Case No.  6:12-bk-08947-KSJ |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | |

### PRELIMINARY MEMORANDUM OPINION SUSTAINING IN PART DEBTOR'S OBJECTION TO CLAIM NO. 7 OF ROBERT AND JANE VAETH

Carli Lucia and her then husband, Bill, opened two preschools, one in Daytona Beach (Bright Beginnings Academy, LLC[1]) and a second preschool, which is the subject of dispute, in Ormond Beach.  Robert and Jane Vaeth gave the Lucia's $1.8 million in part for the purchase of the land and construction of the Ormond Beach preschool.  The Vaeths filed Claim No. 7 in this Chapter 11 case asserting a general unsecured claim for $1,774,435 for *loans* made to the Debtor.  The Debtor objects, claiming the Vaeths' claim either should be disallowed or treated as an equity investment.[2]  The Court partially sustains the objection finding that the Vaeths have an ownership interest in the Debtor equal to their financial contribution but have established no unsecured claim.

Beginning in early 2010, Bill Lucia, a very persuasive salesman, enticed the Vaeths to invest in his business projects, including the Ormond Beach preschool.  In June 2010, Jane Vaeth flew to Florida to meet with Carli, to tour the already open Daytona Beach preschool, and to discuss the building of a new preschool in Ormond Beach.

The Vaeths decided to make a large investment with the Lucias agreeing to be "at-cost investors" in the Debtor's to-be-constructed preschool in Ormond Beach.  There are absolutely

---

[1] Bright Beginnings Academy, LLC filed a Chapter 11 case on June 29, 2012, Case No. 12-8945. The case is still pending without a confirmed plan of reorganization.
[2] Doc. No. 106; Doc. No. 144 at 5, 10-11.

no documents to memorialize the agreement.  Robert Vaeth, relying on Bill Lucia's representations, understood he and his wife would own a proportionate share of the Debtor, with their percentage share determined by how much they invested in relation to the total cost of constructing and equipping the Debtor's business.

The Vaeths total contribution to the Lucias was $1,824,435.  The Vaeths deposited $1,774,435 into a Bank of America account held by the already operating preschool, Bright Beginnings Academy (the "Master Account").  The Vaeths also spent $50,000.00 on their personal credit cards to purchase furniture and equipment for the Debtor.  The monies unquestionably were used to purchase the land used by the Debtor's preschool.  The monies also paid most, if not all, of the construction and furnishing costs for the school, which officially opened in January 2011.

Some portion of the monies likely went to fund the Lucias' living expenses and for other purchases such as the purchase of a boat and a Cadillac.  Neither Carli Lucia nor the Vaeths provided any detailed accounting for the use of the Vaeths' monies.  But, what is known is that Bill Lucia never pursued the other projects he discussed with Robert Vaeth and that, other than monies directly used by the Lucias for their personal needs, all the monies went toward the Debtor's business.  The Court specifically finds that at least $1.5 million of the monies, and probably more, was used by the Lucia's to buy, build, and furnish the Ormond Beach preschool.

Carli Lucia professes ignorance as to the terms of the Vaeths' investment in the Debtor.  She simply relied on her husband, who she divorced later in 2011, to manage the relationship with the Vaeths.  Bill Lucia negotiated the purchase of the real estate, arranged the mortgage, managed the building renovation, and signed all the construction contracts on behalf of Debtor.  Although Carli Lucia was the only person authorized to write checks on the Master Account,[3]

---

[3] Carli Lucia used the Master Account for operating expenses for Bright Beginnings Academy in Daytona Beach, including that preschool's payroll.  It was also used for purchases of jewelry, flowers, clothing, airline tickets, car payments and repairs, haircuts, restaurant meals, and gym fees.

she regularly gave Bill Lucia ten blank checks at a time already signed by her. She absolutely knew that Bill wrote these checks to pay the costs of acquiring and constructing the Debtor's preschool. He made the down payment on the Ormond Beach real estate and paid contractors and suppliers from the funds.

In 2012, after the Lucia's divorce, the Vaeths sued Carli Lucia, as the Debtor's sole owner, in Florida state court demanding the return of their money or ownership of the Debtor. In that litigation, Carli Lucia or her attorney referred to the Vaeths' contributions as loans and promised to pay them back. The Vaeths rely on these statements by Carli Lucia in filing Claim 7 asserting their $1.8 million contribution was a loan, not an equity investment.

The Debtor argues the Vaeths' claim should be disallowed because, at the time the monies were solicited and received from the Vaeths, Carli Lucia did not agree to allow the Vaeths to invest in the Debtor's business in exchange for an ownership interest, nor did she treat the monies as loans. The Debtor disclaims any and all liability to the Vaeths.

The Court finds no agreement ever existed between the Debtor (acting through any person) and the Vaeths that their monies would be treated as a loan. When the Vaeths provided funds for the construction of the Ormond Beach preschool, no one ever agreed at any time that the monies would be repaid, either in a lump sum or over time, with or without interest. Put simply, there was no loan agreement. To that extent, the Court will partially sustain the Debtor's objection to Claim 7.

What the Debtor overlooks, however, is that, while Carli Lucia may not have agreed to allow the Vaeths an ownership share in the Debtor, Bill Lucia did. When the Vaeths infused capital into the Debtor's business, they did so on the understanding they were becoming part-owners of the Debtor. Their understanding resulted from conversations and agreement with Bill Lucia.

Bill Lucia acted as an agent of the Debtor when he entered the agreement with Robert Vaeth that the Vaeths' capital contributions would buy them an ownership interest in the Debtor. Bill Lucia had actual authority to enter into the business relationships necessary to open the Ormond Beach preschool. He had actual authority to raise capital for the project. Bill Lucia was responsible for finding and acquiring the real property for the preschool, financing the property, hiring the contractors and subcontractors, and paying them all. Carli Lucia, the titular owner of the Debtor, clearly knew what Bill was doing. He was an agent of the Debtor who offered the Vaeths an ownership interest in its business in exchange for their capital contributions.

Carli Lucia disingenuously disclaims any knowledge of Bill Lucia's agreement with the Vaeths. But, she cannot refute that Bill Lucia had, at the least, apparent authority to bind the Debtor. She never did anything to communicate to the Vaeths that Bill acted outside the scope of his agency when he promised them a share of the business in exchange for capital. To the contrary, Carli Lucia showed Jane Vaeth the preschool business at a time she knew Bill Lucia was soliciting the Vaeths for joint business opportunities. She hosted the Vaeths in her home when they came to discuss business opportunities with Bill Lucia. She knew the Vaeths saw Bill Lucia entering into financing and construction contracts on behalf of the Debtor; she did not renege on any of those agreements. She knew the Vaeths' monies were deposited into the Master Account and were used to build the Debtor's preschool.

The agreement between Robert Vaeth and Bill Lucia was a contract between the Vaeths and the Debtor.

> The rule is settled in [Florida] that a principal is bound by the acts of his agent. The authority of the agent may be real or it may be apparent and the public may rely on either unless in the case of apparent authority the circumstances are such as to put one on inquiry. The agent's authority may be conferred by writing, by parol, or it may be inferred from the related facts of the case.[4]

---

[4] *Thomkin Corp. v. Miller*, 24 So.2d 48, 49 (Fla. 1945).

Pursuant to the contract, the Vaeths contributed $1,774,435.00 in cash transfers to the mother account plus $50,000.00 in credit card expenditures toward the establishment of Debtor's preschool in Ormond Beach.  In exchange, they received an ownership interest in the Debtor equal to the percentage of the Debtor's startup costs they contributed.  For example, if their contribution was 50% of the startup costs for the Ormond Beach preschool, they own 50% of the equity in the Debtor.

At the evidentiary hearing held on January 16, 2013, neither the Debtor nor the Vaeths established the total construction/start-up costs.  As such, the exact ownership percentage held by the Vaeths is unclear.  Perhaps the Vaeths fully funded the costs and own 100% of the Debtor, perhaps less.  Because the Debtor has the financial records relating to the total cost of construction, the Court directs the Debtor to file an affidavit of Carli Lucia that details all construction and start-up costs for the Debtor **no later than May 17, 2013**.  The Court then will hold a further hearing to determine the accurate start-up costs and to determine the Vaeth's proportionate ownership interest at the evidentiary hearing set for **June 6, 2013 at 10:00 a.m**.

In the interim, the Debtor's Objection to Claim No. 7 of Robert and Jane Vaeth is sustained in part.  Claim No. 7 is properly allowed as a claim for equity in the Debtor.  The exact amount of the Vaeth's ownership interest shall be determined at the hearing on June 6, 2013.

DONE AND ORDERED in Orlando, Florida, on April 16, 2013.

_M.W.M._

_____
KAREN S. JENNEMANN
Chief United States Bankruptcy Judge